UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BRIAN GOLD,

Plaintiff,

v.

U.S. STEEL CORP. d/b/a U.S. STEEL,

Defendant.

Case No. 24-cv-01377-JPG

**MEMORANDUM AND ORDER**

This case is before the Court on Defendant U.S. Steel Corp. d/b/a U.S. Steel's Motion for Summary Judgment (Doc. 51). It asks the Court to enter summary judgment in its favor on all six of Plaintiff Brian Gold's claims. Gold filed a response (Doc. 59), and USS filed a reply (Doc. 63).

## I. BACKGROUND

The material facts of this case are contested. The relevant evidence and the reasonable inferences that can be drawn from that evidence, viewed in the light most favorable to Gold, establish the following facts.

USS produces and sells steel products for a variety of industries. USS owns and operates a facility located in Granite, City, Illinois, known as "Granite City Works." The Pickle Line is a facility within Granite City Works that conditions coils of steel for further processing by uncoiling the steel and pulling the strip through a bath of acid to clean the surface, applying a coating of oil as a protectant and lubricant, continuously side trimming to a specific width, then recoiling and applying bands around the circumference to prevent the coil from uncoiling. The line processes coils totaling approximately 900 tons during an eight-hour turn.

USS is a union company with a workforce subject to the provisions of a Basic Labor Agreement ("BLA"). Under the BLA, employment positions within USS are assigned Labor

Grades ("LG's") which were negotiated between USS and the Steelworkers Union ("Union"). The LGs are identified as grades 1 through 5, with LG 1 being the lowest grade and LG 5 being the highest. Each successively higher LG requires greater skill. Each LG has categories of tasks, which are given formal names known as "functions."

The BLA governs the bidding process on employment opportunities at Granite City Works. Under the BLA, the only "available" jobs are those that are posted for bid. To be considered for a posted position, an employee would need to bid on the posted position. To be awarded an open position on which the employee has bid, among other qualifications, the employee must have seniority over the other bidders. USS does not have authority to remove an employee with more seniority out of his or her incumbent position and replace the employee with another employee.

According to USS's Absenteeism Principles and Rules, an absence is any failure to work all or part of a scheduled shift, including a tardy. An absence without just cause shall be considered an unexcused absence and may result in discipline. Pursuant to Section 9(b) of the BLA, if an employee violates USS policy and is subject to discharge, USS must initially suspend the employee for no more than five (5) calendar days and then attend a disciplinary hearing with the employee if the employee requests a hearing. After attending the disciplinary hearing, USS may convert the suspension to a discharge. The employee can then grieve the discharge. While a grievance relating to discipline, including discharge, is pending, an employee remains eligible to work through the determination of the grievance, via the "Justice and Dignity" program outlined in the BLA.

The LG 1 position in the Pickle Line is referred to as a Utility Person. Utility Persons in the Pickle Line perform the functions of B-Feeder, Welding Machine Helper, Weigher, Scrap Bailer, Slitterman, and Utility Stocker. The parties agree on the duties associated with the

Slitterman ("Slitter") and Utility Stocker functions. The Slitter must lift knives weighing between 50 and 80 and climb stairs. The Utility Stocker serves as a relief worker for all other functions and is expected to climb ladders to the crane, change knives, and cut and move heavy steel scrap.

The parties, however, dispute the duties associated with the B-Feeder, Weigher, and Scrap Baler functions. USS contends that the B-Feeder function requires employees to cut pieces of the steel strip, push heavy scrap off the table, and manipulate the whole strip, which can weigh more than 30 pounds. Gold agrees that the B-Feeder must roll scrap off the table but maintains that he was never required to lift scrap because the Craneman would retrieve it using a magnet. USS argues that the Weigher uses tools weighing more than 10 pounds to tighten bands around the circumference of steel coils and manipulates the end of the steel strips which weigh more than 30 pounds. Gold contends that the Weigher is a data-collection position that does not require employees to physically handle steel strips or to climb. USS contends that the Scrap Baler function requires employees to pull and manipulate heavy bales of scrap trimmed from the sides of coils, use heavy tools to cut the trimmed scrap, and climb stairs. Gold maintains that the Scrap Baler operates an underground machine that coils larger pieces of scrap, which the Craneman then retrieves using a magnet. Gold further asserts that although the Scrap Baler must descend and climb a set of steps to reach the work area, the job itself does not require repeatedly going up and down the steps.

The parties also disagree on whether Utility Persons are required to perform all the functions of the position. USS contends that an employee must master every function to qualify as a Utility Person. Gold, however, maintains that, in practice, no one on the line was qualified to perform all the functions.

Gold was hired by USS on December 10, 2018, and assigned to the Pickle Line as a Utility Person. His pre-employment physical examination paperwork, completed in August 2018, noted that he had diabetes. Gold was diagnosed with diabetes at age 16. Managing his diabetes requires him to constantly check his blood sugar, give himself an insulin injection daily, and carefully watch what he eats or drinks.[1]

Gold was a bargaining unit employee, and the terms and conditions of his employment were governed by the BLA. At all relevant times herein, Gold's supervisors were Laura Ahlers ("Ahlers") and Alan Whitt ("Whitt"). Gold was qualified to perform the functions of B-Feeder, Welding Machine Helper, Weigher and Scrap Bailer of the Utility Person position in the Pickle Line and signed off on each one after successfully "breaking in" on each function. He then was assigned to "break-in" on the Slitter function. Gold experienced pain in his fingers and feet, along with numbness in his hands and legs, while performing the Slitter function. He told Whitt of his diagnosis of diabetic neuropathy and his concerns about signing off on the function. Still, USS continued to require him to perform the Slitter function.

Throughout 2023, Gold accumulated unexcused absences and/or tardies. This included an absence on January 8, 2023; tardies on March 21 and 22, 2023; absences on March 23, 24, and 28, 2023; and a tardy on May 24, 2023. Gold does not dispute that his records show absences and tardies and admits that some of them were valid write-ups. However, he contends that at least some of his tardies were unlawfully administered in retaliation for him exercising protected activity.

---

[1] Gold contends that he was diagnosed with diabetic neuropathy in 2021 or 2022 by his Endocrinologist. In support of this fact, he cites his deposition testimony. However, his statement that he was diagnosed with diabetic neuropathy in 2021 or 2022 by an unknown endocrinologist is inadmissible hearsay, and Gold has not made any showing that it "could readily be replaced at trial by admissible evidence." *Minor v. Ivy Tech State Coll.*, 174 F.3d 855, 856–57 (7th Cir. 1999). Thus, the Court has not considered this evidence.

As a result of the May 24, 2023, tardy and potential discharge, Gold was scheduled to attend a 9(b) disciplinary hearing on June 21, 2023, in accordance with the terms of the BLA. USS employees, including Ahlers, and Union members attended Gold's 9(b) hearing. During the hearing, Gold had the opportunity to provide explanations for the absences which subjected him to discipline. For some of the absences, his explanation was determined by USS to be sufficient to reverse the disciplinary action. Gold's May 24, 2023, tardy, however, was converted to a discharge. USS notified Gold that he was discharged, pending any grievance filed through his Union. Gold filed a timely grievance. As a result, he remained eligible for work at USS via Justice and Dignity until the outcome of the grievance was determined.

On June 21, 2023, after the 9(b) meeting, Gold told Ahlers that he did not want to sign-off on the Slitter function because he had diabetic neuropathy that caused numbness in his hands and feet when he performed the function. In response, Ahlers instructed Gold to provide medical documentation. Four weeks later, on July 26, 2023, Gold provided a note from a local urgent care facility to USS's medical clinic known as Veeder Health Clinic ("VHC"). The note, prepared by Troy Dowers, M.D., states: "Return to work 7/27/2023. No climbing and/or lifting weights over 10 pounds." VHC provided Dr. Dowers' medical restrictions to Ahlers.

Ahlers evaluated the restrictions and determined that Gold was unable to perform his job as a Utility Person on the Pickle Line because every function required him to regularly lift more than 10 pounds and to climb. Ahlers informed VHC that no work was available for Gold. She then reached out to the Union, informed it that Gold could not perform any of his job functions with the restrictions, and suggested that since she had spoken to Gold and understood his concerns to only be with the Slitter function, he should go back to the doctor to get a revised note that would

allow him to perform more functions of the Utility Person position.

On August 3, 2023, Gold provided VHC another medical note from the same urgent care facility, from Sharice Johnson, P.A. The note states: "Return to work 8/4/2023. No climbing, squatting, or lifting heavier than 30 pounds." Four days later, on August 7, 2023, Gold provided USS with a note from his chiropractor, Christopher Howard, D.C. The note stated: "Brian Gold is being treated in the office for bilateral hand and leg numbness. While under care, we recommend that he refrains from lifting over 30 lbs., squatting, and climbing." Ahlers reviewed the restrictions from VHC relating to the notes dated August 3 and 7, 2023. Thereafter, Ahlers contacted the Union and suggested Gold have the notes revised because he would not be able to perform the various functions of his position with these restrictions. Specifically, Ahlers recommended for him to request his healthcare provider include more specific language regarding climbing, such as whether the climbing restriction was in relation to ladders or stairs.

On August 24, 2023, Dr. Howard provided another note for Gold, stating: "Brian Gold is being treated in the office for bilateral hand and leg numbness. While under care, we recommend that he refrains from lifting over 30 lbs., and limits squatting, and climbing." Ahlers evaluated whether Gold could perform any of the functions of the Utility Person position with these restrictions. She determined that Gold's restrictions prevented him from performing all but one function—Welding Machine Helper. That function, however, was assigned exclusively to another employee whose own restrictions limited him to that position and who had greater seniority than Gold. As such, Ahlers determined that no functions were available for Gold to perform within his restrictions. Gold disputes USS's contention that there were no functions of the Utility Person position that he could perform. Specifically, he claims that he could have performed the B-Feeder,

Weigher, and Scrap Baler functions.

On January 8, 2024, Gold sought and found employment elsewhere. USS was not aware of Gold's new employment. The parties dispute when Gold's employment with USS terminated. USS claims that Gold remained an employee in case his restrictions improved or changed, and was only terminated on April 4, 2025, after Gold failed to respond to a letter from USS instructing him to contact VHC for a re-evaluation and to submit documentation supporting his continued absence. Gold, however, contends that his last day worked was July 28, 2023, when his access badge was locked out. He also alleges that he has not received a paycheck from USS since July 2023, and his employee benefits ceased on or about late July 2023.

Gold filed this action on May 23, 2024, and amended his complaint on May 31, 2024. His amended complaint asserts claims against USS for disparate treatment (Counts 1 and 4), failure to accommodate (Counts 2 and 5), and retaliation (Counts 3 and 6) in violation of the Americans with Disabilities Act ("ADA") and the Illinois Human Rights Act ("IHRA").

## II. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014) (citing FED. R. CIV. P. 56); *accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). In assessing a summary judgment motion, the Court views the facts in the light most favorable to and draws all reasonable inferences in favor of the nonmoving party. *Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). However, the "favor toward the nonmoving party does not extend to drawing inferences

that are supported by only speculation or conjecture." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (internal quotation marks and citation omitted)).

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the moving party fails to meet its strict burden, the Court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986); *Modrowski*, 712 F.3d at 1168–69. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

## III. ANALYSIS

At the summary judgment stage, courts apply the same framework to claims under the ADA and the IHRA. *See Teruggi v. CIT Grp./Cap. Fin.. Inc.*, 709 F.3d 654, 659 (7th Cir. 2013); *Hammond v. Cahokia Unit Sch. Dist. #187*, No. 3:25-cv-01283-DWD, 2026 WL 852531, at *6

(S.D. Ill. Mar. 27, 2026). Thus, although the Court will speak in terms of the ADA, its analysis applies equally to the IHRA.

To survive summary judgment on his claims under the ADA, a plaintiff must offer evidence from which an inference of discriminatory intent can be drawn. To present this evidence, a plaintiff may utilize the *McDonnell Douglas* burden-shifting framework. *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367–68 (7th Cir. 2019). Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination. *Id.* at 368. If a plaintiff successfully demonstrates a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action. *Id.* If the defendant is able to provide evidence of such a reason, the burden shifts back to the plaintiff to show the articulated reason is a pretext. *Id.* At the pretext stage, the plaintiff must provide evidence that the employer's stated reason for the adverse action is dishonest and that the true reason for the action is discriminatory intent. *McGowan v. Deere & Co.*, 581 F.3d 575, 581 (7th Cir. 2009). The ultimate burden of persuasion remains at all times with the plaintiff. *See Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

A. Counts 1 and 4 – Disparate Treatment:

The ADA prohibits an employer from discriminating against a "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To state a *prima facie* case for disparate treatment, a plaintiff must present evidence that "(1) he suffers from a disability as defined in the ADA, (2) he is qualified to perform the essential functions of the job in question, with or without reasonable

accommodation, and (3) he has suffered an adverse employment action as a result of his disability." *Dargis v. Sheahan*, 526 F.3d 981, 986 (7th Cir. 2008).

Under the ADA, "disability" means: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). To determine the essential functions of a position, the Court gives deference to the employer's judgment about what functions are essential to the job. 42 U.S.C. § 12111(8); *Feldman v. Olin Corp.*, 692 F.3d 748, 755 (7th Cir. 2012). However, the employer's judgment is not conclusive. Other factors that may bear on whether the function is essential to the job include "the amount of time spent on a function, the experience of those who previously or currently hold the position, and the consequences of not requiring the employee to perform the function." *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 628 (7th Cir. 2020).

A reasonable jury could find that Gold has established a *prima facie* case of disparate treatment and that USS's articulated reason for termination of him was pretextual. First, Gold has produced evidence that he has a physical impairment causing numbness in his arms and legs, which restricts his ability to lift more than 30 pounds and limits his ability to squat and climb.[2] Although Gold's amended complaint alleges that he is disabled by diabetic neuropathy that causes numbness in his arms and legs, his failure to produce admissible evidence establishing that diagnosis is not fatal to his claim. The ADA does not focus on a particular diagnosis; it focuses on whether an

[2] To the extent that Gold now claims he is disabled because of diabetes, which requires him to constantly check his blood sugar, give himself an insulin injection daily, and carefully watch what he eats and drinks, he relies on an entirely different disability, with different limitations, than the disability alleged in his amended complaint. Raising this basis for disability would require an amendment to the complaint, which in turn would require leave of court and a showing of good cause. *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017). Gold has neither sought leave to amend nor made such a showing.

impairment "substantially limits one or more major life activities." 42 U.S.C. § 12102(1). Here, the evidence establishes substantial limitations that are consistent with those alleged in the amended complaint.[3]

Second, Gold has pointed to evidence that he was qualified for the Utility Person position with or without reasonable accommodation. USS contends that the position includes multiple functions—B-Feeder, Welding Machine Helper, Weigher, Scrap Bailer, Slitterman, and Utility Stocker—all of which are essential. Gold, however, disputes that each of these functions is an essential duty. Specifically, he contends that, in practice, no employee in the Utility Person position is qualified to perform all these functions. This evidence shows more than merely how the work is distributed at a given moment; it shows USS's "real rules and expectations." *Davis v. City of Chicago*, 889 F.3d 842, 845 (7th Cir. 2018) (quoting *Fairley v. Andrews*, 578 F.3d 518, 523 (7th Cir. 2009)); *see also Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 242 (7th Cir. 2018) ("Although the employer's judgment is considered an important factor, it is not determinative, and we also look to evidence of the employer's actual practices in the workplace."). Given the competing evidence, a reasonable jury could find that not all the functions USS identifies are essential to the Utility Person position. *See Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687 (7th Cir. 2020) ("Whether a function is essential is a question of fact, not law."). And in light of Gold's evidence that he was capable, even with his restrictions, of performing the B-Feeder, Weigher, and Scrap Baler functions, a reasonable jury could conclude that he was qualified for the Utility Person position, with or without reasonable accommodation.

---

[3] It is not entirely clear from the record whether Gold's impairment substantially limits a major life activity. But drawing all reasonable inferences in Gold's favor, and in the absence of any argument from USS to the contrary, the Court assumes that it does for the purposes of this motion.

Third, Gold has provided evidence that he suffered an adverse employment action based on his disability. Gold claims that he told one of his supervisors, Whitt, that he had diabetic neuropathy and was concerned about signing off on the Slitter function, and shortly after, he was issued "bogus write-ups" for not clocking in before the start of his normal shift. He further alleges that, just after he told his other supervisor, Ahlers, about his diabetic neuropathy and desire not to sign off on the Slitter function, he was locked out of the facility and effectively terminated, despite being eligible to work through the Justice and Dignity program. Given this timeline, a reasonable jury could conclude that the discipline and termination were the result of Gold's disability. This evidence further supports a finding of pretext because USS's purported reason for terminating Gold—his unexcused absences—rests on "bogus write-ups" that Gold received only after disclosing his disability. Accordingly, there is a genuine issue of material fact that precludes summary judgment as to Counts 1 and 4.

B. <u>Counts 2 and 5 – Failure to Accommodate:</u>

The ADA describes discrimination to include:

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

42 U.S.C. § 12112(b)(5)(A). To establish a *prima facie* case for failure to accommodate, a plaintiff must prove that "(1) plaintiff was a qualified individual with a disability; (2) defendant was aware of his disability; and (3) defendant failed to accommodate his disability reasonably." *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). The ADA defines "qualified individual" to mean "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8).

From the evidence presented, a reasonable jury could find that Gold has established a *prima facie* case of failure to accommodate. As discussed above, Gold has pointed to evidence that he has a physical impairment that causes numbness in his arms and legs, which restricts his ability to lift more than 30 pounds and limits his ability to squat and climb; that USS knew about his disability from his statements to Whitt and Ahlers and the doctors notes he provided to Ahlers; that despite his disability, he was qualified to perform multiple functions within the Utility Person position; and that USS failed to reasonably accommodate his disability by refusing to excuse him from performing the Slitter function. Thus, there is a genuine dispute of material fact that precludes summary judgment on Counts 2 and 5.

C. Counts 3 and 6 – Retaliation:

The ADA also forbids retaliation: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). To establish a *prima facie* case of retaliation, a plaintiff must prove he engaged in activity protected by the ADA, that he suffered adverse action, and that the adverse action was caused by the protected activity. *Rowlands v. United Parcel Serv. – Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018).

A plaintiff engages in a statutorily protected activity by seeking accommodation or by raising a claim of discrimination based on her disability. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814–15 (7th Cir. 2015). An action is adverse if it would "dissuade a reasonable person from engaging in protected activity." *Henry v. Milwaukee Cnty.*, 539 F.3d 573, 586 (7th Cir. 2008). The element of causation requires a plaintiff to prove that, but for his protected

activity, he would not have suffered the adverse consequence. *Rowlands*, 901 F.3d at 801. This is true even if the complaint constituting the protected activity had no merit. *Id.*

A reasonable jury could find that Gold has established a *prima facie* case of retaliation. He has produced evidence that he has a physical impairment which caused him to experience numbness in his hands and feet while performing the Slitter function; that he requested an accommodation that would allow him to remain in the Utility Person position without performing that function; and that USS locked him out of the facility and removed from the work schedule almost immediately after he made that request. Although Gold accumulated unexcused absences and/or tardies, and one of those tardies had been converted to a discharge before he requested accommodation, Gold remained eligible to work through Justice and Dignity pending resolution of his grievance. A reasonable jury could conclude that USS's decision to lock Gold out of the facility and decline to schedule him for another shift constituted an adverse action that would have dissuaded a reasonable employee from engaged in protected activity. Therefore, there is a genuine dispute of material fact that precludes the entry of summary judgment on Counts 3 and 6.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** USS's Motion for Summary Judgment (Doc. 51). The Court will set a telephone status conference by separate order to pick dates for the Final Pretrial Conference and Trial.

**IT IS SO ORDERED.**
**DATED**: **November 20, 2026**

**J. PHIL GILBERT**
**United States District Judge**